UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COENERGY TRADING COMPANY,
a Michigan Corporation,

                Plaintiff,                Case No. 5:04-CV-47

v.                                          HON. DAVID W. McKEAGUE*

SUN CHEMICAL CORPORATION,
a Delaware Corporation,

                Defendant.
_____/

**OPINION OF THE COURT
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The parties to this action had a business relationship for several years whereby plaintiff CoEnergy Trading Company ("CTC") sold natural gas to defendant Sun Chemical Corporation ("Sun Chemical") for use in its pigment manufacturing facility in Muskegon, Michigan. Sun Chemical terminated the relationship in August 2001, advising CTC that it would refuse to accept deliveries of natural gas from CTC after August 31, 2001. CTC filed suit, alleging in a four-count complaint that Sun Chemical's actions were in breach of contract. Now before the Court is Sun Chemical's motion for summary judgment, seeking judgment as a matter of law on all four claims.

**I. FACTUAL BACKGROUND**

The material facts are largely undisputed. CTC and Sun Chemical entered into a Gas Sales Agreement ("umbrella agreement") on September 24, 1997. Article I of the umbrella agreement

_____

    \* Hon. David W. McKeague, United States Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

provides in relevant part:

>   1.1 From time to time, DTE-CoEnergy[1] and Sun may agree to the sale of natural gas under the terms of this Agreement. Such periodic agreements to sell natural gas shall be in the form of a Sales Contract (Exhibit "A"), and shall become a part of this Agreement.
>
>   1.2 Unless agreed to in the form of a Sales Contract, neither DTE-CoEnergy nor Sun shall be obligated under this Agreement to buy or sell any given quantity of gas in any given period.

"Exhibit A," attached to the umbrella agreement, is a one-page form entitled "Sales Contract," which includes certain standard terms and conditions, blanks for variable terms, *i.e.*, price, volume and time period, as well as signature and date blanks.

Article III of the umbrella agreement provides as follows:

>   3.1 The term of this Agreement shall commence on the date first written above [September 24, 1997] and shall continue until it is terminated by either party upon at least 30 days prior written notice to the other party.
>
>   3.2 The term of each Sales Contract shall be as provided in that Sales Contract.
>
>   3.3 The termination of this Agreement shall not terminate any Sales Contract then in effect, which contract shall continue for the term provided for in that Sales Contract, and the provisions of this Agreement shall continue to be effective as to such contract.

Sun Chemical undisputedly gave written notice of termination of the umbrella agreement pursuant to ¶ 3.1 by letter dated July 11, 2001, indicating it would not be purchasing natural gas from CTC after its August 2001 requirements were filled. At issue in this litigation is whether a sales contract was then in effect which, pursuant to ¶ 3.3, obligated Sun Chemical to continue buying natural gas from CTC through August 2002. Resolution of this question depends on the legal import

---

[1] When the umbrella agreement was entered into, CTC was known as DTE-CoEnergy, L.L.C. CTC was subsequently acquired by and became a subsidiary of DTE Corporation.

of largely undisputed oral communications between representatives of the parties in February 2001.

During the Fall of 2000 and early Winter of 2001, the parties had begun discussing the possibility of a long-term 18-month sales contract, for the period March 1, 2001 to August 31, 2002. Negotiations were conducted by Paula Legard and Michael Rork on behalf of Sun Chemical, and Ivan Bearinger on behalf of CTC. Because Sun Chemical had not entered into such a long-term contract before, and because the cost of natural gas, relatively high at the time, had been fluctuating, Sun Chemical insisted that a "price protection" provision be included in the sales contract. That is, Sun Chemical demanded inclusion of a mechanism whereby it would be entitled to a downward adjustment of the agreed initial price if the market price of natural gas dropped during the 18-month term of the sales contract. *See* Bearinger dep. pp. 39-40; Legard dep. pp. 34-37; Rork dep. pp. 15-17.

Pursuant to these negotiations, on February 22, 2001, Mr. Bearinger forwarded to Ms. Legard a proposed sales contract covering the period March 1, 2001 to August 31, 2002. It had not been signed by any representative of CTC. It was to be signed on behalf of Sun Chemical and returned to Bearinger. The contract was said to include the terms and conditions telephonically agreed to on February 21, 2001. The contract included the parties' agreed initial price and monthly volume estimates, but did not include any price protection provision. For this reason, Sun Chemical refused to execute the proposed sales contract.

Legard recalls that she made Bearinger aware of the deficiency in a telephone conversation in late March or early April, advising that Sun Chemical would not sign the contract until an acceptable price protection provision was included. Legard dep. p. 38. Bearinger had been aware that price protection was an important term and that Sun Chemical wanted to have it spelled out in the sales contract. Bearinger dep. pp. 39-40. When the omission was brought to his attention, he

3

seemed to be unaware that the provision had not been included and implied that he would find out why. Legard dep. pp. 38-39. He assured Legard in May that he would make the necessary changes and that a revised sales contract, including the agreed price protection provision, would be issued. Bearinger dep. p. 22. Yet, despite continuing efforts by Legard and Bearinger, the proposed sales contract remained unchanged and unexecuted. As of May 30, 2001, in conjunction with DTE Corporation's acquisition of CTC, CTC became subject to a policy prohibiting it from amending existing contracts and from entering into new contracts. *Id.* at 23, 41. Shortly thereafter, on or about July 1, Bearinger resigned his employment with CTC.

In the meantime, Sun Chemical had continued to receive monthly deliveries of natural gas in accordance with the price and volume terms orally agreed to on February 21, 2001. On July 11, 2001, however, Mr. Rork advised CTC in writing that Sun Chemical would not be purchasing natural gas from CTC after August 2001. Although Rork's letter offers no reason for termination of the parties' relationship, the decision was precipitated by CTC's failure to provide a sales contract with the agreed price protection provision. Rork dep. pp. 27-29. On behalf of CTC, Joseph L. Yestrepsky responded by letter dated July 24, 2001. The letter communicated CTC's position that Sun Chemical was obligated, by virtue of the February 2001 agreement, to continue purchasing natural gas from CTC at the agreed price through July 31, 2002. The letter alludes to discussions concerning price relief, but reflects Mr. Yestrepsky's understanding that the parties had been unable to reach agreement on such a term. Further discussions between Rork and Yestrepsky ensued, but they failed to reach an agreement on price protection. Yestrepsky dep. pp. 30-31.

In August 2001, Sun Chemical sought bids from other natural gas suppliers. CTC was invited to participate, but declined. On August 22, 2001, Rork sent an e-mail message to Yestrepsky

4

specifically requesting that CTC make no delivery to Sun Chemical in September. This message was followed by another from Rork on September 4, advising Yestrepsky that Sun Chemical had entered into a contract with another natural gas supplier and that no deliveries from CTC would be required in the future. Nonetheless, Rork learned sometime prior to September 10 that CTC *had* delivered natural gas to Sun Chemical for September 2001. Rork dep. pp. 42-43. Rork then advised Richard Werner of MichCon (Michigan Consolidated Gas), through whose pipelines the delivery was made, that CTC was no longer authorized to deliver gas to Sun Chemical. Yet, Sun Chemical received the September delivery of natural gas, consumed it, and did not pay CTC the invoiced amount of $27,800. Rork dep. pp. 42-43. Sun Chemical refused to pay for the September delivery because the contract with CTC had been terminated and Sun Chemical had specifically directed CTC not to make the September delivery. *Id.*

CTC filed its complaint on April 9, 2004. This Court's jurisdiction is premised on the parties' diversity of citizenship. Count I is a claim for breach of contract. By refusing to accept natural gas deliveries from CTC after August 31, 2001, Sun Chemical is said to have breached the oral agreement reached on February 21, 2001, resulting in damages to CTC in the amount of $906,005.13. In count II, CTC asserts a second breach of contract claim, alleging Sun Chemical wrongfully refused to pay the contracted-for amount of $27,800 for the September 2001 natural gas delivery. CTC alleges in count III that Sun Chemical's wrongful actions constitute a breach of its obligation of good faith in the performance of the contract, in violation of M.C.L. § 440.1203. Count IV sets forth a claim for relief based on promissory estoppel. CTC alleges that it reasonably relied, to its own detriment in the amount of $933,805.13, on promises made by Sun Chemical when the February 21, 2001 agreement was reached. CTC contends Sun Chemical is now estopped to refuse

to perform as promised. Sun Chemical seeks summary judgment on all four claims.

## II. ANALYSIS

The motion for summary judgment requires the Court to look beyond the pleadings and determine, based on the record presented, including deposition transcripts, affidavits, admissions on file and other documentary evidence, whether there is a genuine issue of material fact for trial or whether, on the other hand, the evidence is so one-sided that one party must prevail as a matter of law. *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 431 (6th Cir. 2004). The Court must review the record in the light most favorable to the nonmoving party, drawing all reasonable factual inferences in the nonmovant's favor. *Terry v. LaGrois*, 354 F.3d 527, 530 (6th Cir. 2004). To withstand a properly supported motion for summary judgment, the nonmovant must present affirmative evidence sufficient to support a reasonable jury finding in its favor. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

### A. *Count I Breach of Contract*

CTC's count I claim is premised on Article I of the September 1997 Gas Sales Agreement, or umbrella agreement:

> 1.4 If either party (the Defaulting Party") fails to meet its obligations to deliver or receive gas under a Sales Contract, and its failure is not excused by any provision of this Agreement or the Sales Contract, then the Defaulting Party shall pay the other party any monetary loss experienced upon the commercially reasonable purchase of replacement gas, or the commercially reasonable sale of gas to an alternative market, as the case may be, ....

CTC alleges that Sun Chemical failed to meet its obligations to receive gas under the February 21, 2001 sales contract. Yet, ¶¶ 1.1 and 1.2 of Article I are clear: a periodic agreement for the sale of natural gas is not enforceable as part of the umbrella agreement, and neither party is obligated

thereunder to buy or sell any given quantity of gas in any given period, *unless* agreed to "in the form of a Sales Contract" as exemplified by the cited form.

Was the understanding reached by the parties through oral communications on February 21, 2001 agreed to in the form of such a sales contract? Clearly, an *attempt* was made to memorialize the parties' understanding in the form of a sales contract. The proposed sales contract forwarded by CTC to Sun Chemical on February 22 accurately reflected the parties' agreement as to initial price and estimated volumes. Representatives of both parties acknowledge, however, that the parties' hoped for agreement to the proposed 18-month time period was conditioned upon inclusion of an acceptable price protection provision. Both parties agree that the proposed sales contract did not include an acceptable price protection provision. Both sides also agree that they never reached agreement on the language of such a provision. Moreover, it is undisputed that because of this deficiency, the proposed sales contract was never signed by either party.

Hence, Sun Chemical argues there was no enforceable "sales contract," as defined by the parties in the umbrella agreement, that obligated it to receive deliveries of natural gas beyond the date the umbrella agreement was effectively terminated. On this essential element of CTC's count I claim, Sun Chemical contends, there is no genuine issue of material fact.

CTC's response is feeble and unavailing. CTC contends that Sun Chemical's insistence on inclusion of a price protection provision was not communicated until several weeks after the proposed sales contract had been forwarded to Sun Chemical. CTC contends that the parties had reached a meeting of the minds on February 21, that it was accurately reduced to writing in the form of the proposed sales contract, and that Sun Chemical's refusal to sign it was unjustified.

CTC's position finds no support in the record. In fact, it is contradicted by the deposition

7

testimony of its own former employee, Ivan Bearinger, the only CTC representative who participated in the negotiations leading up to the proposed sales contract. As detailed above, Bearinger's uncontroverted testimony indicates, consistent with Legard's, that he knew, prior to February 21, that price protection was important to Sun Chemical and that acceptable language needed to be included in the sales contract. When he learned that the provision had not been included, he did not balk, but assured Legard the contract would be corrected. CTC's argument that Sun Chemical's insistence on price protection was an afterthought is thus totally unsubstantiated. Rather, inclusion of an agreeable price protection provision appears clearly to have been a condition precedent to Sun Chemical's agreement to an 18-month time period. Based on the present record, no reasonable jury could find for CTC on this point. CTC has thus failed to adduce evidence supporting the proposition that the parties had reached a meeting of the minds, "in the form of a Sales Contract," obligating Sun Chemical to buy natural gas from CTC through August 31, 2002.

CTC maintains that even if the parties failed to reach agreement on price protection and duration of the contract, their agreement on initial price and estimated monthly volumes evidences a contract sufficiently definite to support an appropriate remedy, pursuant to M.C.L. § 440.2204(3). That the parties had reached agreement on price and volumes, CTC contends, is evidenced by their course of conduct from March to August 2001, when deliveries and payments were made in accordance with the agreed terms. Citing *Michigan Bean Co. v. Senn*, 93 Mich. App. 440, 444-45 (1979), CTC urges the Court to enforce an 18-month term as an impliedly assumed obligation.

In Michigan's version of the Uniform Commercial Code, M.C.L. § 440.2204(3) provides as follows:

8

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Putting aside the question whether this UCC provision can be used to breathe life into a stillborn agreement that failed to conform to the specific requirements of a "sales contract," as prescribed by the parties in their umbrella agreement,[2] it is clear in any event, based on the language of the provision itself, that it has no application to the instant facts.

If CTC had, pursuant to the parties' oral agreement, made deliveries of agreed volumes of natural gas, and Sun Chemical had received but refused to pay the agreed price for the deliveries, CTC's argument would be stronger.[3] Then, the Court could find "a reasonably certain basis for giving an appropriate remedy" and enforce the terms of the parties' oral agreement for deliveries actually made and received notwithstanding the parties' failure to agree on the duration of the sales contract. But here, CTC asks the Court to enforce the very term, *i.e.*, duration, which, for lack of an acceptable price protection provision, was the subject of an express disagreement. This term was not "left open." Rather, Sun Chemical expressly refused to enter into an 18-month sales contract until an acceptable price protection provision was included. Inasmuch as both parties recognize they did not achieve a mutual understanding on this condition precedent to an agreement on duration, imposition of an 18-month obligation on Sun Chemical would be directly contrary to its manifest

---

[2] Under the UCC, the general rule is that parties are free to make their own contracts for the sale and purchase of goods and are free to vary or supersede provisions of the UCC. *See* M.C.L. § 440.1102; 1 White & Summers, *Uniform Commercial Code*, § 3-2 (4th ed. 1995).

[3] This, of course, is the argument made by CTC in support of its count II breach of contract claim, regarding the September 2001 delivery of natural gas. As seen below, however, CTC's argument regarding the September 2001 delivery in particular, is undercut by clear and uncontroverted evidence that Sun Chemical had by then effectively terminated not only the umbrella agreement, but also the oral agreement under which the parties had been operating.

intention and could hardly be characterized as "an appropriate remedy."

The instant facts are thus materially distinguishable from those presented in *Michigan Bean*, where the parties' mutual agreement on all essential terms was evident in the terms of their signed contract and in the course of their performance. In *Michigan Bean*, the Michigan Court of Appeals properly enforced contractual obligations consistent with, not contrary to, the intentions of the parties. Here, however, CTC asks the Court to "fill a gap" in the parties' agreement in a manner directly at odds with Sun Chemical's intention, a measure clearly beyond the remedial purposes of M.C.L. § 440.2204(3).

Accordingly, the Court concludes, with respect to count I, that there is no genuine issue of material fact and that defendant Sun Chemical is entitled to summary judgment on CTC's breach of contract claim under Article I of the umbrella agreement.[4]

**B.** *Count II Breach of Contract*

The precise nature of CTC's count II breach of contract claim is not spelled out in the complaint. Nor has this claim received much attention in the parties' summary judgment briefs. Inasmuch as CTC has separated out its claim for damages stemming from the September 2001 delivery of natural gas, it impliedly relies on the oral agreement under which the parties operated during the period March 1 to August 31, 2001. That is, CTC appears to allege that, even if the parties are deemed not to have entered into a binding sales contract for the entire 18-month period, the parties' course of performance during the initial 6-month period evidences the existence of an

---

[4] This analysis of the count I breach of contract claim, concluding as a matter of law that there was no contractual agreement obligating Sun Chemical to receive and buy estimated volumes of natural gas from CTC at the agreed initial price through August 2002, makes it unnecessary for the Court to address Sun Chemical's statute of frauds defense.

oral contract, based on the agreed initial price and estimated monthly volumes, which was observed by both parties month-to-month until September 2001, when Sun Chemical received but did not pay for the agreed delivery. In count II, CTC thus prays for enforcement of this oral contract through award to it of the invoiced amount of $27,800.

As intimated in footnote 3, above, the Court would not be unsympathetic with this claim but for the uncontroverted evidence that Sun Chemical timely and effectively terminated not only the umbrella agreement, but also the oral contract, well in advance of the September 2001 delivery. Sun Chemical points to Rork's July 11, 2001 letter and e-mail messages of August 22, 2001 and September 4, 2001, all disavowing any request for natural gas deliveries after August 2001. These communications demonstrate that Sun Chemical had clearly and unambiguously advised CTC of its intention to terminate the oral agreement prior to the September 2001 delivery. Because the oral agreement was indefinite in duration, it was terminable at will by either party on reasonable notice. M.C.L. § 440.2309(2). Rork's communications indicate that reasonable notice was given.

CTC has not responded to this showing in any way. Most importantly, it has failed to adduce *evidence*, tending to show that it did not receive any of these communications or otherwise creating a genuine issue of material fact. In response to a properly supported motion for summary judgment, the nonmovant cannot simply rest on its pleadings, but must come forward with significant probative evidence in support of its claim to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). CTC has not carried its burden in response to Sun Chemical's motion. On the present record, there is no basis for a finding other than that Sun Chemical gave reasonable and effective notice of termination. Hence, the oral contract had ceased to exist when the September 2001 delivery was made and CTC's breach of oral contract claim is unsubstantiated. It follows that

there is no genuine issue of material fact and Sun Chemical is entitled to summary judgment on count II as well.

## C. *Count III Breach of Duty of Good Faith*

CTC's count III claim builds on the count I and II claims for breach of contract. In addition to breaching the contract, CTC alleges that Sun Chemical violated its statutory duty of good faith in the performance of the contract. M.C.L. § 440.1203. In the foregoing analysis, the Court has explained that both of CTC's breach of contract claims must fail for lack of an enforceable contract conferring the asserted rights and imposing the asserted duties. Absent the existence of an enforceable contract, there is no duty of good faith enforceable under M.C.L. § 440.1203. *See Schering-Plough Healthcare Products, Inc. v. NBD Bank, N.A.*, 890 F.Supp. 651, 658-59 (E.D. Mich. 1995). Accordingly, Sun Chemical is also entitled to summary judgment on count III.

## D. *Count IV Promissory Estoppel*

In count IV, CTC asserts a promissory estoppel claim, alleging that Sun Chemical orally promised on February 21, 2001 to purchase the agreed estimated monthly volumes of natural gas at the agreed price for the next 18 months. In reliance on this promise, CTC secured the requisite supplies of natural gas to satisfy Sun Chemical's needs during the ensuing 18-month period. When Sun Chemical reneged on its promise, CTC alleges it was forced to resell the gas it had purchased at a substantially discounted rate, resulting in total damages of at least $933,805.13.

The standards governing a promissory estoppel claim under Michigan law are summarized by the Michigan Court of Appeals as follows:

> The elements of promissory estoppel are (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or

12

> forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided. .... In determining whether a requisite promise existed, we are to objectively examine the words and actions surrounding the transaction in question as well as the nature of the relationship between the parties and the circumstances surrounding their actions. .... We are to exercise caution in evaluating an estoppel claim and should apply the doctrine only where the facts are unquestionable and the wrong to be prevented undoubtable.

*Novak v. Nationwide Mutual Ins. Co.*, 235 Mich. App. 675, 686-87 (1999) (citations omitted). As Sun Chemical argues, however, promissory estoppel may not be invoked to override the express terms of a written contract between the parties covering the same subject matter. *APJ Associates, Inc. v. North American Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003); *Martin v. East Lansing Sch. Dist.*, 193 Mich. App. 166, 179-80 (1992).

The asserted promise to purchase natural gas during the subject 18-month period is in the nature of a "periodic agreement to sell natural gas," described in Article I of the parties 1997 umbrella agreement. Article I, as detailed above, specifically provides that neither party is obligated to buy or sell any given quantity of gas in any given period unless agreed in the form of a sales contract. Under the promissory estoppel claim, CTC would have the Court impose on Sun Chemical an obligation to buy natural gas even though, as explained above, the parties failed to reach agreement in the form of a sales contract. Promissory estoppel is not available to afford relief in such direct contravention of the parties' express contractual agreement.

CTC insists the terms of the umbrella agreement were modified by the course of the parties' performance. Because of the nature of the industry and rapid fluctuations in natural gas prices, CTC contends it was customary for the parties to act on telephonic agreements which were only later memorialized in writings signed by the parties. Wayne Fox aff. ¶ 3. Hence, the argument goes, CTC was entitled to rely on Sun Chemical's oral promise even though it was never reduced to writing in

the form of a sales contract.

Yet, as demonstrated by Sun Chemical, irrespective of the role of oral telephonic communications, the parties consistently observed the contractual requirement of reducing their agreements to writings in the form of sales contracts. At best, evidence of course of performance might substantiate a finding that the parties reasonably took immediate short-term actions in reliance on oral agreements, in anticipation of subsequent memorialization of the agreements. There is, however, no evidence that either party expressly or impliedly waived the Article I proviso that neither party would be *obligated* to buy or sell gas unless their agreement was incorporated into a sales contract. *See Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 373-74 (2003) (holding that where course of conduct is asserted as basis for modification of unambiguous contract, mutual assent to waiver of contractual requirement must be shown by clear and convincing evidence).

Thus, CTC was *arguably* justified in taking *short-term* action in reliance on the parties' February 21, 2001 oral agreement pending execution of the required sales contract. Yet, even then, Ivan Bearinger, on behalf of CTC, knew that Sun Chemical was unwilling to enter into an 18-month commitment unless an acceptable price protection provision was included in the sales contract. Bearinger ought to have known, when he forwarded the proposed sales contract to Sun Chemical on February 22, 2001, that it did not include such a provision. At that point, there was no good reason for CTC to anticipate that Sun Chemical would execute the proposed contract for an 18-month term. The omission of the price protection provision was brought to Bearinger's attention four to six weeks later, when Paula Legard unequivocally confirmed that the contract was not acceptable. Despite continuing negotiations, the parties never did reach agreement on a price protection provision.

14

Objectively examining the words and actions surrounding the transaction as well as the relationship between the parties, the Court finds no evidentiary support for a finding that CTC's purchase of natural gas sufficient to supply Sun Chemical's needs for the next 18 months was reasonably induced by any promise made by Sun Chemical. Under Michigan law, only *reasonable* reliance is subject to protection under the doctrine of promissory estoppel. *State Bank of Standish v. Curry*, 442 Mich. 76, 84 (1993). "[R]eliance is reasonable only if it is induced by an actual promise." *Id.* There having undisputedly been no promise by Sun Chemical to commit to an 18-month period, CTC's reliance thereon cannot have been reasonable. It follows that CTC's promissory estoppel claim is not factually supported and that Sun Chemical is entitled to summary judgment on this claim as well.

## III. CONCLUSION

For the foregoing reasons, defendant Sun Chemical's motion for summary judgment will be granted in its entirety. Sun Chemical will be awarded summary judgment on all four of CTC's claims. A judgment order consistent with this opinion shall issue forthwith.


Dated: July 11 , 2005                              /s/ David W. McKeague
                                                   HON. DAVID W. McKEAGUE
                                                   UNITED STATES CIRCUIT JUDGE